The Kantrow Law Group, PLLC
Attorneys for TSFV Holdings, LLC
732 Smithtown Bypass, Suite 101
Smithtown, New York 11787
516 703 3672
fkantrow@thekantrowlawgroup.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re:                                                            Chapter 7

**ROBERT S. LAVECCHIA,**                         Case No.: 25-12421-pb

                **Debtor.**
-----------------------------------------------------------X

**TSFV HOLDINGS, LLC,**

                **Plaintiff,**

      -against-                                              Adv. Pro. No. 26-

**ROBERT S. LAVECCHIA,**

                **Defendant.**
-----------------------------------------------------------X

## COMPLAINT

This is an adversary proceeding seeking to determine that the debt due and owing by Robert S. Lavecchia, the debtor/defendant ( "Debtor," "Defendant," or "Lavecchia"), to TSFV Holdings, LLC., Plaintiff/creditor ("Plaintiff" or "Creditor") is in the nature of a debt that cannot be discharged pursuant to section 523 of title 11 of the United States Code (the "Bankruptcy Code").

## JURISDICTION AND VENUE

1.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(1) and 1334.

2.      This adversary proceeding relates to the case captioned herein now pending before this Court.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

4. The statutory predicate for the relief sought herein is section 523 of the Bankruptcy Code.

**THE PARTIES**

5. Plaintiff is TSFV Holdings, LLC, a Delaware limited liability company with an address for service of process of 1010 El Camino Read, Menlo Park, CA 94025.

6. Defendant is an individual with an address for service of process of 244 Fifth Avenue, 2443, New York, NY 10001.

**FACTS**

7. On September 23, 2025 (the "Petition Date"), Defendant, as a Debtor, filed a voluntary petition for relief from his creditors pursuant to chapter 7 of the Bankruptcy Code. Gregory M. Messer serves as the chapter 7 trustee (the "Trustee").

8. The Court fixed March 17, 2026, as the last date by which a party could timely commence an action against the Debtor pursuant to sections 523 or 727 of the Bankruptcy Code. This adversary proceeding was commenced on March 15, 2026, and is therefore timely.

9. Prior to the Petition Date, on or about May 27, 2016, Plaintiff herein commenced an action in the Supreme Court of the State of New York, County of New York, against Defendant and Mulberry Development, LLC ("Mulberry"). The action was styled *TSFV Holdings, LLC, on its own behalf and on behalf of Peak Performance NYC, LLC v. Mulberry Development, LLC, and Robert Lavecchia,* bearing Index No. 652865/2016 (the "State Court Action").

10. In the State Court Action, Plaintiff alleged that Lavecchia (and Mulberry) engaged in fraud, theft, willful breach of contract and other misconduct which caused millions of dollars in damages to Plaintiff (as well as Peak Performance NYC, LLC, hereinafter referred to as "Peak").

11. These claims arose out of Peak hiring Mulberry as a general contractor to construct a state-of-the-art fitness facility on the 10th and 11th floors of 90 Fifth Avenue in New York City. Mulberry agreed to perform the work for Peak at a guaranteed fixed price of $2,553,592 and to complete the work by December 11, 2015 – a timetable that Mulberry knew was critical to the success of Peak's business, and a timetable with which Mulberry expressly agreed to comply.

12. In early December, 2015, however, Peak discovered that Mulberry and its subcontractors had negligently over-demolished a terra cotta structural ceiling on the 11th floor of the premises, creating a serious structural hazard. Mulberry acknowledged that it was responsible to repair the structural damage it has caused; however, Mulberry soon realized that these repairs would delay the project well beyond the required December 11, 2015 completion date and also consume Mulberry's profit under the fixed-price contract. Accordingly, both Mulberry and Lavecchia secretly decided to extract whatever additional payments they could from Peak and then walk off of the job, leaving Peak to (literally) clean up their mess.

13. To this end, on December 28, 2015, Mulberry submitted a requisition for payment demanding $464,913.02 for work that Mulberry had allegedly completed. Upon inspection, Peak discovered that Mulberry had, in fact, not completed the work, and that the required structural repairs to the 11th floor had not been made. Lavecchia tried to strong-arm Peak into paying the requisition, claiming that work could not continue on the project until the subcontractors had been paid. Knowing that Peak was under immense time pressure to complete the project, Lavecchia demanded a $200,000 advance (the "Advance") against the requisition and expressly promised that such sums would be delivered to the plumber and electrician, so that they would continue work on the project. Lavecchia's conducted constituted extortion under the penal law.

14. In reliance on Lavecchia's false promise, Peak reluctantly paid the Advance, but Lavecchia simply pocketed the money and then caused Mulberry to walk off the job without notice a mere two days after cashing the check – in breach of contractual obligations – leaving the project in a shambles. Lavecchia's failure to disburse the Advance to the subcontractors constituted an improper diversion of trust funds under New York Lien Law and is considered grand larceny under the penal law.

15. Lavecchia's criminal conduct also included altering executed and notarized lien waivers from subcontractors.

16. When Peak sought to reassemble the subcontractors in an attempt to complete the project and mitigate its damages, Lavecchia interfered and dissuaded the subcontractors from working directly with Peak, by, among other things, falsely telling the subcontractors that Mulberry had never been paid by Peak. In addition, Lavecchia willfully exaggerated liens against Peak's premises and encouraged subcontractors to file liens as well.

17. In order to finance the construction as well as the operation of the planned gym (the "Gym") on or about August 24, 2015, Peak and TSFV executed a credit agreement (the "Credit Agreement") pursuant to which TSFV would loan and extend credit to Peak in order to permit it to build and operate the GYM at the premises.

## THE CONSTRUCTION PROJECT

18. As stated herein, Peak stressed to Mulberry the importance of timely completion of the project. Three days before the project was to start, on or about August 12, 2015, Mulberry bid on the project after reviewing the construction plan and drawings and with full knowledge that timely completion of the project was critical.

19.     Mulberry's bid was almost $200,000 less than the bid submitted by the contractor Peak had previously selected.  In or about late August, 2015, Peak accepted Mulberry's bid on the project.

20.     On or about September 11, 2015, Mulberry and Peak entered into the construction contract, whereby Mulberry committed to demolishing, renovating and constructing the premises for the purposes of operating the Gym (the "Contract").

21.     Mulberry was required to "achieve Substantial Completion of the entire [Project] not later than [] 90 days from the date of [the Contract]."

22.     Peak stressed the importance of the critical timeline of completing the Project to Mulberry numerous times before the execution of the Contract and during the course of the Project.

## PERFORMANCE UNDER THE CONTRACT

23.     On September 11, 2015, Peak paid Mulberry a $75,000 mobilization payment under the Contract to commence work.

24.     In October and November 2015, Mulberry submitted two requisitions for payment for work that it had completed.  Peak paid Mulberry's first two requisitions for payment.

25.     In early December 2015, as the Project was supposed to be nearing completion, Peak discovered that Mulberry and its HVAC contractor had caused significant structural damages to the premises.  In connection with the installation of certain HVAC equipment, Mulberry had over-demolished a terra cotta structural element in the ceiling of the 11th floor of the premises.

26.     The proper scope of the demolition of this terra cotta ceiling was specifically set forth in the plans and specifications that were a part of the Contract, yet Mulberry negligently failed to follow or even read these specifications.

27. Peak's representatives promptly called this negligent work to the attention of Mulberry, which acknowledged its error and conceded that it was required to repair and restore the terra cotta ceiling at its own expense.

28. Mulberry understood that the repairs to the terra cotta ceiling necessitated as a result of its own negligence would delay the Project well beyond the December 11, 2015 substantial completion date as provided for in the Contract.

29. Moreover, Mulberry understood that the costs associated with the repairs necessitated by its own negligence would eliminate any profit that Mulberry could otherwise have realized from the Contract.

30. As a result, Lavecchia decided to extract whatever additional payments he could from Peak and then abandon the project.

## THE THIRD REQUISITION AND MULBERRY WALKS-OFF THE PROJECT

31. During December 2015, Peak and Mulberry continued to discuss how Mulberry was to complete the Project and complete the structural repairs required by its negligence. While Lavecchia conveyed to Peak that Mulberry intended to complete its performance pursuant to the Contract, Lavecchia secretly harbored the intent to abandon the Project as soon as he could extract more money from Peak.

32. Mulberry submitted an untimely application for payment styled as a third pencil requisition for payment under the Contract (the "Third Pencil Requisition") dated December 28, 2015, requesting an additional payment in the amount of $464,913.02 for work allegedly completed.

33. In this Third Pencil Requisition, Mulberry set forth that the Project was 71% complete.

34.     Peak and its architect performed a walk-through of the premises to determine whether the Third Pencil Requisition accurately reflected work that had been performed and for which Peak was entitled to be paid.

35.     At the walk-through, Peak and its architect observed that there were numerous and significant inaccuracies in the Third Pencil Requisition and that the amount Mulberry sought was grossly overstated.

36.     Peak discovered that the vast majority of the work for which Mulberry demanded $464,913.02 had not been completed, and that some of it had barely even been commenced.

37.     Peak advised Mulberry that the Third Pencil Requisition needed to be corrected to include only work that was actually complete, and that the Third Pencil Requisition had to contain "all the appropriate backup of lien waivers and insurances [,]" which Mulberry had omitted from its original requisition (and which the Contract required).

38.     After Peak confronted Lavecchia about having requested payment for work not yet completed, and with the clear evidence that Lavecchia had no ability to complete the Project, Lavecchia changed his approach.

39.     While Lavecchia did not dispute that the work set forth in the Third Pencil Requisition was incomplete, he threatened to completely halt the project if Peak did not hand over funds in order for Mulberry to pay certain subcontractors.

40.     Knowing the critical timeline under which Peak was operating, Lavecchia demanded a Advance against the Third Pencil Requisition, purportedly to pay its subcontractors; otherwise, Lavecchia threatened that Mulberry would walk off the job.

41.     The threat to walk off the job was a breach of the express terms of the Contract.

42. Lavecchia attempted to induce Peak to make payments that were not due by stressing that the electrician and plumber were "pressing/critical" subcontractors and that he had a "need to get these guys paid."

43. Lavecchia had no intention of paying these subcontractors, and in fact never did pay them, but he made a false promise to pay them in order to induce Peak to make payments that were not due under the Contract.

44. Lavecchia knew that he could exert pressure on Peak by threatening delay because Lavecchia knew that any additional delay would substantially harm the Project and cause Peak to lose millions of dollars.

45. In reliance on Lavecchia's false representations that he would cause the payments to be made to the subcontractors and that Mulberry would continue its work on the Project in order to meet the agreed upon timeline, Peak remitted the Advance to Mulberry by check dated January 6, 2016, which was delivered to Lavecchia on or about January 13, 2016. Lavecchia caused the check to be cashed on January 13, 2016.

46. On January 15, 2016, Mulberry abandoned the Project. Lavecchia retained the Advance for himself and never paid the subcontractors that he promised to pay with the funds.

47. When Peak sought to reassemble the subcontractors in an attempt to complete the Project, Lavecchia deliberately interfered with Peak's efforts, told subcontractors that Peak had never paid it and dissuaded the subcontractors from continuing to work on the Project, in an attempt to exert even greater pressure on Peak.

<u>**THE FILING OF SUCCESSIVE AND WILLFULLY EXAGGERATED LIENS**</u>

48.    In an effort to inflict further damages upon Peak, Mulberry, at the direction of Lavecchia, filed two willfully exaggerated liens against the Premises, and encouraged subcontractors to do the same.

49.    Despite admitting that it was owed only $264,913.00, on March 8, 2016, Mulberry filed a lien alleging that it was owed $1,035,104.97, an amount that more than four times the amount Mulberry previously claimed it was owed (the "<u>First Lien</u>"). This First Lien was willfully exaggerated.

50.    In connection with the First Lien, demand was made upon Mulberry to provide an itemized statement to support the exaggerated amount. Due to Mulberry's failure to provide such an itemized statement, a court of competent jurisdiction discharged the First Lien.

51.    On April 26, 2016, Mulberry, at the direction of Lavecchia, filed a second lien, alleging that was now owed $412,190.41, less than half of what it claimed in the First Lien, but still substantially more than was owed, if anything (the "<u>Second Lien</u>").

52.    The Second Lien encompassed the same period of time and the same work alleged to be completed as the First Lien.

53.    The fact that the Second Lien was for less than half the amount of the First Lien, but covering the same period of time and work is incontrovertible, *prima facie* evidence that the First Lien was exaggerated.

54.    On January 15, 2016, the day Mulberry ceased work at the Project, Mulberry claimed that it was owed $264,913 and since that date no work was approved or completed.

55.    Accordingly, the Second Lien sought almost $150,000 more than Mulberry alleged it was owed on the day it walked off the Project.

## FAILURE TO PAY SUBCONTRACTORS

56.     Mulberry was required to pay its subcontractors with the payments it received from Peak, including the Advance.

57.     Under Article 3 of New York Lien Law, the funds Mulberry received from Peak are considered trust funds and thus were required to be held in trust and turned over to the subcontractors.  Lavecchia directed and caused Mulberry not to pay its subcontractors.

58.     This is so despite the fact that Mulberry was required to use its "best efforts" to keep the Project free from mechanic's liens.

59.     In the event that a mechanic's lien was filed by a subcontractor hired by Mulberry, Mulberry was required, within ten days' notice of such lien to cause such liens to be discharged and terminated, or to be bonded.

60.     Mulberry, under the direction of Lavecchia, failed to discharge liens consistent with its contractual obligations.

61.     Mulberry failed to bond such liens consistent with its contractual obligations.

62.     Moreover, in the event that liens were placed on the premises, Mulberry was required to "indemnify [Peak] for all resulting costs incurred due to the lien, including attorneys' fees.

63.     Following Mulberry walking off the Project, and contrary to its obligations to keep the premises free from liens, Mulberry, through Lavecchia, instead encouraged its subcontractors to file liens by falsely telling the subcontractors that Peak failed to pay; such actions caused the filing of three additional mechanic's liens against the premises, to wit:

> (a)     on or about April 13, 2016, subcontract J. Caiazzo Plumbing and Heating Corp. ("Caiazzo"), filed a lien in the amount of $252,091.52 (the "Caiazzo Lien");

(b)    on or about April 18, 2016, subcontractor A.R. Equipment, L.L.C. ("AR") filed a lien in the amount of $8,846.09 (the "AR Lien");

(c)    on or about May 20, 2016, subcontractor T.P. Rental Services, Inc., ("TP") filed a lien in the amount of $2,878.59 (the "TP Lien"); and,

(d)    on or about May 25, 2016, subcontractor Godfrey's Refrigeration and Air Conditioning Inc. ("Godfrey") filed a lien in the amount of $135,462.38 (the "Godfrey Lien").

64. Lavecchia knew that each of the liens were filed as a direct result of his encouragement.

65. Mulberry took no efforts to have these liens removed, even though it was obligated to keep the premises free from liens. Instead, Lavecchia aided, abetted, and encouraged these mechanics' liens to be filed.

66. Peak also paid subcontractors and vendors approximately $599,972, which included a payment of $42,849.20 that Peak made to a contractor that Peak was forced to hire in order clean up the mess that Lavecchia and Mulberry left behind when Mulberry abandoned the Project.

67. In addition to this egregious conduct, Lavecchia also altered executed and notarized lien waivers from subcontractors. By way of example, Lavecchia altered a waiver from Benjamin Maintenance by using "white-out" to change the original sum on the fully executed and notarized lien waiver.

### TSFV LOANS MONEY TO PEAK TO SATISFY THE LIENS

68. On or about May 6, 2016, TSFV entered into a settlement agreement with Caiazzo (the "Caiazzo Settlement Agreement"). Pursuant to this Settlement Agreement, TSFV agreed to pay Caiazzo certain sums to discharge the Caiazzo Lien.

69. TSFV also entered into a settlement agreement with TP (the "<u>TP Settlement Agreement</u>") pursuant to which TP agreed to terminate and discharge its lien.

**<u>THE FAILURE TO COMPLETE THE CONTRACT</u>**

70. At Lavecchia's direction, Mulberry engaged in willful and malicious conduct, including the theft of funds intended for subcontractors. Mulberry's negligence in over-demolishing the terra cotta ceiling and causing structural damage, its unwarranted delays in the Project, and its actions in abandoning the Project all resulted in devastating and irreversible damages to Peak's business and the Project. Lavecchia knew this.

71. On January 15, 2016, following Mulberry's walk-off, Peak served Mulberry with a termination notice as provided for in the Contract.

72. As a direct result of Mulberry's actions at the direction of Lavecchia, Peak was unable to execute its business plan and defaulted on its lease for the premises.

73. On or about April 29, 2016, Peak's landlord served Peak with a default notice, alleging, among other things, that Peak defaulted under the lease by abandoning the premises and as a result of Peak's failure to keep the Project appropriately staffed and moving forward.

74. Peak's default permitted its landlord to seek clawback of $2,614,183, which it had credited to Peak pursuant to the lease, which provided in the event of default, the entire amount of the rent abatement and any broker fees paid by the landlord would become reimbursable to the landlord.

75. Peak's default resulted in a substantial draw down of the line of credit provided by TSFV, resulting in the loss of millions of dollars.

76. Peak's default resulted in a negotiation and eventual settlement with the landlord to mitigate its liability.

77. Lavecchia's actions intentionally interfered with, hindered, and delayed, and ultimately prevented, Peak's ability to complete the Project.

78. Lavecchia's actions also adversely affected TSFV's collateral causing it substantial damages.

79. The lease was "fully a part of the Contract" between Mulberry and Peak.

80. Peak's rights under both the lease and the Contract were assignable. The Contract anticipated and permitted Peak to "without consent of [Mulberry] assign the Contract to a lender providing financing for the project.

81. Lavecchia knew that Peak had assigned its rights in the Contract and the lease to TSFV as collateral for the Credit Agreement.

## THE TRIAL

82. On April 8, 2025, the State Court Action went to trial before Hon. Carol Sharpe, J.S.C. The trial was conducted before a jury.

83. After several days of testimony, on April 17, 2025, the trial was concluded and the Court provided the jury with its charge and instructions.

84. Lavecchia acted pro se at the trial.

85. The Court instructed the jury regarding whether Peak was entitled to damages from Mulberry for beach of contract and explained to the jury that the basic principle of damages in a contract action was to leave the injured party in as good as a position as he or she would have been in if the contract had been fully performed.

86. The Court instructed the jury as to the meaning of intent, and stated that intent involves the state of mind with which an act is done *i.e.*, if a person acts voluntarily with a desire to bring about a result, he or she is said to have intended the result, and although he or she has no

desire to bring up all the result, if he or she does the act knowing with substantial certainty that the result will follow, he or she is also said to have intended the result.

87. The Court further stated that it was alleged that Lavecchia failed to pay Mulberry's subcontractors, that he caused Mulberry to walk off the project, and that he filed multiple liens against the building which resulted in Peak's breach of its contract with the landlord, and that if the State of New York were to find that Lavecchia acted with the desire to bring about that result, or that he knew with substantial certainty that such a result would follow, Lavecchia would be found to have intended the result.

88. The Court further instructed the jury that it was alleged that Lavecchia failed to pay Mulberry's subcontractors, that Mulberry walked off(and that Lavecchia caused Mulberry to walk off the project) and that he filed multiple liens against the project which resulted in Peak's breaching of the loan agreement with TSFV, and if the jury were to find Lavecchia acted with the desire to bring about that result, or that he knew with substantial certainty that such a result would follow, Lavecchia would be found to have intended the result.

89. The Court explained to the jury that TSFV made the following six claims: (i) that Peak had a contract with its landlord to lease the space at 90 Fifth Avenue to build and operate the gym; (ii) that Lavecchia knew about the contract; (iii) that Lavecchia intentionally induced Peak to breach the contract by causing Mulberry to breach its construction contract with Peak preventing Peak from performing under the terms of its contract; (iv) that Peak did in fact breach the lease; (v) that Peak would not have breached the contract if had not been for Lavecchia's conduct; and (vi) that TSFV sustained damages as a result of Peak's breach.

90. During the course of the trial, TSFV alleged that Mulberry was a mere instrument of or tool of Lavecchia and that therefore Mulberry and Lavecchia were one in the same.

91. During the course of the trial, TSFV alleged that Lavecchia should be held liable for Mulberry's actions.

92. The Judge instructed the jury that in order to find that Lavecchia was the alter-ego of Mulberry they had to find that Lavecchia completely controlled Mulberry and that Lavecchia used his complete control to commit a fraud or dishonest or unjust act in connection with the transactions alleged at trial.

93. The Court instructed the jury as to the verdict sheet it was to use in making its determinations.

94. Question number one required the jurors (at least five of the six) to state the amount of damages to which TSFV was entitled.

95. The Court instructed the jury as to question number two that it was to determine whether Mulberry failed to pay its contractors which performed work on the Project.

96. The Court instructed the jury as to question number three that it was to determine the amount of damages to award TSFV sustained as a result of Mulberry's failure to pay its subcontractors.

97. The Court instructed the jury as to question number four that it was to determine whether or not Lavecchia oversaw or decided as to Mulberry's failure to pay its subcontractors.

98. The Court instructed the jury as to question number five that it was to determine if any damages were to be awarded to TSFV sustained as a result of Mulberry's tortious interference in connection with either the lease or the credit agreement.

99. The Court instructed the jury as to question number six that it was to determine whether Lavecchia knew about the lease between Peak and the landlord.

100. The Court instructed the jury as to question number seven that it was to determine whether Lavecchia acted with the intention of causing Peak to breach the lease agreement.

101. The Court instructed the jury as to question number eight that it was to determine whether Peak would have breached its lease agreement if not had not been for Lavecchia's conduct.

102. The Court instructed the jury as to question number nine that it was to determine the damages sustained by Peak as a result of Lavecchia's conduct.

103. The Court instructed the jury as to question number ten that it was to determine whether Lavecchia knew about the credit agreement between Peak and TSFV.

104. The Court instructed the jury as to question number eleven that it was to determine whether Lavecchia acted with the intention of causing Peak to breach the credit agreement with TSFV.

105. The Court instructed the jury as to question number twelve that it was to determine if Peak would have breached the credit agreement if it had not been for Lavecchia's conduct.

106. The Court instructed the jury as to question number thirteen that it was to determine the damages sustained as a result of Lavecchia's conduct as to the breach of the credit agreement.

107. The Court instructed the jury as to question number fourteen that it was to determine whether Lavecchia dominated and controlled Mulberry.

108. The Court instructed the jury as to question number fifteen that it was to determine whether Lavecchia used his domination and control of Mulberry to cause wrongful or inequitable consequences to Peak and TSFV.

## THE JURY VERDICT

109. The jury returned the following verdict (the "Verdict"):

- Question No. 1: Damages in the amount of $7,974,762

- Question No. 2: Did Mulberry fail to pay its subcontractors who performed work related to Mulberry's contract with Peak Performance? – Yes

- Question No. 3: Damages in the amount of $60,459 as a result of Mulberry's failure to pay its subcontractors

- Question No. 4: Did Lavecchia oversee or decide Mulberry's failure to pay its subcontractors? – Yes

- Question No 5: Damages sustained as a result of Mulberry's tortious interference with the lease agreement in the amount of $6,231,259. Damages sustained as a result of Mulberry's tortious interference with the credit agreement in the amount of $1,683,44

- Question No. 6: Did Lavecchia know about the lease between Peak and its landlord? – Yes

- Question No. 7: Did Lavecchia act with intention of causing Peak to breach the lease? – Yes

- Question No. 8: Did Lavecchia cause Peak to breach the lease if it had not been for Lavecchia's conduct? – No

- Question No. 9: With regard to the lease, the amount of Peak's damages sustained as a result of Lavecchia's conduct - $6,231,259

- Question No. 10: Did Lavecchia know about the credit agreement between Peak and TSFV? – No (therefore questions 11 – 13 were not answered)

- Question No. 14: Did Lavecchia dominate and control Mulberry? – Yes

- Question No. 15: Did Lavecchia use his domination and control of Mulberry to cause wrongful or inequitable consequences? – Yes

**AS AND FOR A FIRST CAUSE OF ACTION FOR RELIEF
NON DISCHARGEABILITY PURSUANT TO 11. U.S.C. § 523(a)(2)(A)**

110.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 108 as if each were more fully set forth herein.

111.    Section 523(a)(2)(A) of the Bankruptcy Code provides in pertinent part that a debt for money, property or services, should be excepted from discharge to the extent obtained by false pretenses, a false representation, or actual fraud.

112. Lavecchia owes a debt to TSFV as set forth by a jury after trial in the State Court Action.

113. Based upon the detailed allegations set forth herein and in the Verdict, Lavecchia's conduct satisfies each element of section 523(a)(2)(A), as follows: (a) Lavecchia made materially false representations to Peak – including his express promise to deliver the Advance to subcontractors – knowing those representations were false; (b) Lavecchia made those representations with specific intent to deceive Peak and thereby induce payment of funds not contractually due; (c) Peak justifiably relied on Lavecchia's representations in making the Advance; and, (d) such reliance directly and proximately caused the damages sustained by Peak and, by extension, TSFV as Peak's secured lender and assignee of Peak's rights under the construction contract and lease.

114. Moreover, Lavecchia's course of conduct – using Mulberry as an alter ego to extract payments, abandon the Project, file willfully exaggerated liens, and interfere with Peak's subcontractors – constitutes a fraudulent scheme directed at defeating TSFV's collateral position and credit agreement rights.

115. The funds obtained by Lavecchia – including, without limitation, the Advance – were obtained by false pretenses and false representations. In addition, the full extent of TSFV's damages flows from Lavecchia's actions, which included the diversion of trust funds, the filing of willfully exaggerated mechanic's liens, the intentional interference with Peak's subcontractors, and the deliberate destruction of Peak's ability to perform under its lease – thereby impairing TSFV's collateral and causing it to sustain the damages awarded by the jury.

116. Peak, and by extension TSFV, as found by the jury, relied upon the representations made by Lavecchia and as a result suffered the damages as awarded by the jury pursuant to the Verdict.

117. Lavecchia engaged in a fraudulent scheme was the direct and proximate cause of the damages to TSFV.

118. To the extent any portion of the judgment amount corresponding to Question No. 1 ($7,974,762) reflects damages attributable to breach of contract, such damages arose directly from and were proximately caused by Lavecchia's fraudulent scheme. Mulberry's breach of the construction contract was not an independent commercial failure – it was the deliberate mechanism by which Lavecchia extracted the Advance under false pretenses, abandoned his obligations, and destroyed Peak's business and TSFV's collateral. The fraud infected and caused the entirety of the damages, including those denominated as contract damages by the jury.

119. By virtue of the foregoing, Lavecchia's debt to TSFV must be excepted from any discharge to which Lavecchia may otherwise be entitled pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

## AS AND FOR A SECOND CAUSE OF ACTION FOR RELIEF
## NON DISCHARGEABILITY PURSUANT TO 11 U.S.C. 523(a)(4)

120. TSFV repeats and realleges each and every allegation contained in paragraphs 1 through 116 as if each were more fully set forth herein.

121. Section 523(a)(4) of the Bankruptcy Code provides in pertinent part that a debt arising as result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" shall be excepted from discharge.

122.     Under Article 3-A of the New York Lien Law, funds received by a general contractor from an owner constitute trust funds that must be held for, and paid over to, subcontractors and materialmen.  Lavecchia, as the individual who dominated and controlled Mulberry (the general contractor), directed and caused Mulberry to receive trust funds – including the Advance – and to divert those funds to his own personal use rather than paying subcontractors as required by law and by his own representations.

123.     Pursuant to the jury's finding on Question No. 4, Lavecchia personally oversaw and decided Mulberry's failure to pay its subcontractors.  This conduct constitutes embezzlement and larceny within the meaning of section 523(a)(4), for which TSFV has standing as the party directly injured by the downstream consequences of the trust fund diversion, including the mechanic's liens filed against Peak's premises and the resulting destruction of TSFV's collateral.

124.     Lavecchia committed embezzlement and larceny within the meaning of section 523(a)(4) by: (a) receiving the Advance as trust funds subject to the New York Lien Law Article 3 trust; (b) converting those funds to his own use under false pretenses; (c) failing to pay the subcontractors for whose benefit the funds were held in trust; (d) falsifying lien waivers to conceal his misappropriation; and, (e) encouraging subcontractors to file additional liens against Peak's premises as a mechanism to exert further economic pressure.  Each of these acts constituted knowing conversion of funds in which third parties had a superior right, and each directly caused or contributed to the damages sustained by TSFV.

125.     Lavecchia's embezzlement consisted of the fraudulent appropriation of property – namely, the Advance and the Lien Law trust funds entrusted to Mulberry – to his own use, with knowledge that such appropriation was wrongful and with intent to deprive the rightful beneficiaries thereof.  The jury's finding on Question No. 4 (that Lavecchia personally oversaw

and decided Mulberry's failure to pay subcontractors) establishes Lavecchia's knowing and intentional participation in the misappropriation. The resulting harm to TSFV flows directly from the subcontractors' filing of mechanic's liens and the consequent destruction of Peak's ability to perform under the lease, which impaired TSFV's collateral and caused the damages the jury awarded.

126. Lavecchia further committed acts that constitute larceny under New York Penal Law §§ 155.05 & 155.40 – and thus within the meaning of section 523(a)(4) – by wrongfully taking, obtaining, and withholding the Advance by means of false representations, and by altering executed and notarized lien waivers (including the waiver of Benjamin Maintenance) to facilitate the concealment of his actions. These acts of larceny directly and proximately caused the damages to TSFV, as they set in motion the cascade of mechanic's liens, subcontractor interference, and lease default that destroyed TSFV's collateral position.

127. Lavecchia knew that he was diverting the funds, as the jury found in the Verdict.

128. By virtue of the foregoing, Lavecchia's debt owed to TSFV must be excepted from discharge to which Defendant may otherwise be entitled pursuant to section 523(a)(4) of the Bankruptcy Code.

**AS AND FOR A THIRD CAUSE OF ACTION FOR RELIEF**
**PURSUANT TO 11 U.S.C. § 523(a)(6)**

129. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 as if each were more fully set forth herein.

130. Section 523(a)(6) of the Bankruptcy Code provides, in pertinent part, that a debt arising as a result of "willful and malicious injury by the debtor to another entity or to the property of another entity" shall be excepted from discharge.

131.     As set forth herein, Lavecchia's actions were willful and malicious within the meaning of section 523(a)(6). The jury's finding on Question No. 7 – that Lavecchia acted with the specific intention of causing Peak to breach its lease – is a determination that Lavecchia subjectively desired the injurious result. The jury instruction on intent required the jury to find either that Lavecchia acted with a desire to bring about the harmful result, or that he knew with substantial certainty that the result would follow – and the jury found in TSFV's favor on that instruction.

132.     Each act by which Lavecchia harmed TSFV – including directing Mulberry to abandon the Project, diverting the Advance, filing willfully exaggerated liens, interfering with Peak's subcontractors, and altering lien waivers – was undertaken willfully and maliciously, with the subjective intent to cause the resulting harm or with knowledge that the harmful result was substantially certain to follow.

133.     Lavecchia purposefully, intentionally, willfully, and maliciously harmed TSFV, knowing and intending to cause the specific injuries that resulted, as established by the jury's findings. Specifically, the jury found that Lavecchia dominated and controlled Mulberry (Question No. 14); that he used that domination to cause wrongful or inequitable consequences to Peak and TSFV (Question No. 15); that he acted with the specific intention of causing Peak to breach its lease (Question No. 7); and, that he personally directed Mulberry's failure to pay subcontractors (Question No. 4). Each of these findings was litigated over nine years of State Court proceedings. The non-dischargeable damages include at minimum the damages attributable to Lavecchia's intentional interference with the lease ($6,231,259, per Questions No. 7 and 9, plus interest).

134. By virtue of the foregoing, Lavecchia's debt to TSFV must be excepted from any discharge to which Defendant may otherwise be entitled pursuant to section 523(a)(6) of the Bankruptcy Code.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an Order denying the discharge of the debt owed to Plaintiff by Defendant pursuant to sections 523(a)(2)(A); 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

Dated: Smithtown, New York
      March 15, 2026

      The Kantrow Law Group, PLLC
      *Attorneys for TSFV Holdings, LLC*

      By:     /s/ *Fred S. Kantrow*
           Fred S. Kantrow

      732 Smithtown Bypass, Suite 101
      Smithtown, NY 11787
      Telephone:   (516) 703-3672
      Email: fkantrow@thekantrowlawgroup.com